Judge Draxler, and may it please the court. The question in this case is whether the petitioner is deportable for having been convicted of a crime involving moral turpitude that was committed within five years after, quote, the date of admission. The facts of the case are not in dispute. The parties agree that the petitioner was initially admitted in 2001 on a three-year visa, that he was readmitted in 2003 on the same visa, and that he committed the crime at issue in 2007. So the only question before the court is whether the petitioner reset the five-year clock in 2003 when he was readmitted to the country. I still don't read all the questions, whether we should give Chevron deference to that interpretation by the BIA. Well, no. The first question, of course, is under step one, is whether Congress has spoken to the precise question at issue. It's ambiguous, is what you're saying, whether the statute of Congress is something here that would be of cause to determine. Correct. Well, we argue that we win under step one, and that if the court finds the statute ambiguous, we also win under step two. If I could address first the step one argument. In both instances, the question is whether there's Chevron deference. And to do that, first have your first step to determine, was it ambiguous, and did it need to speak, and whether that interpretation was something that was reasonable. Correct. So we argue first that the statute is not ambiguous, that the intent of Congress is clear with respect to the question at issue in this case. Yeah, I'm just trying to focus this, because I don't want to get mixed up on everything else. It's really about Chevron deference in the determination of those two steps. Correct. That's what you want to address now. Go ahead. Yes, with the court's permission. So under the first step of Chevron, the traditional tools of statutory construction demonstrate that Congress did not intend the five-year clock to be reset when non-immigrants leave and reenter the country within an existing period of admission. Now, I would like to emphasize two points about step one of Chevron. First, the language of the statute is the starting point of the analysis, but it is not the ending point. It is not enough to say, as the government does, that the statute is ambiguous simply because it does not spell out how to determine the date of admission in cases involving aliens who have been admitted on multiple occasions. The court must employ all the traditional tools of statutory construction before it can deem the intent of Congress unclear. Second, the court should limit its focus to the precise question at issue in this case, which is whether the five-year clock is reset when a non-immigrant leaves and reenters the country. Even if the court finds that Congress did not speak to other scenarios, it can find that the intent of Congress is clear with respect to this particular issue. So if you apply the traditional tools of statutory construction to this particular issue, it is clear that Congress intended petitioner's original admission in 2001 to serve as the date of admission. For instance, in a nearby provision, Congress provided that aliens who are admitted on U or T visas may apply for permanent residency if they have been, quote, physically present in the United States for a continuous period of at least three years since the date of admission as a non-immigrant. At the same time, Congress provided that such aliens are deemed to break their physical presence if they travel outside the country for a single period exceeding 90 days or collective periods exceeding 180 days. So in combination, these provisions make clear that Congress used the phrase the date of admission to refer to the initial admission on a U or T visa, not the most recent admission. If such aliens acquired a new date of admission every time they traveled abroad, then the three-year clock would be reset every time, and the provision that exempt departures of 90 or 180 days would just be considered completely superfluous. Now, other provisions in Section 1227 also strongly suggest that Congress did not intend aliens to reset the five-year clock every time they reentered the country. Is your construction key to this situation where he leaves on vacation as opposed to other situations where the alien leaves for other reasons? The purpose of the departure is not important. It's wrong. What matters is whether the alien leaves and reenters within his existing period of admission, whether he went on vacation or, you know, for professional reasons, is not material in our view. What in the statute talks about an existing period of admission? Well, the relevant phrase is the period of admission. The phrase period of admission is used throughout the INA. So our point is that it is one thing when an alien leaves the country pursuant to the expiration of his period of admission and then returns years later on some other visa. In that case, yes, it makes sense to reset the five-year clock because the alien is accruing a new benefit when he reenters the country. Okay, but aren't we required to look at the statute that talks about the date of admission? Yeah, that is the ultimate question. What is the date of admission? And here, we don't dispute that 2003 is a date of admission. He has two dates of admission, 2001 and 2003. Our contention is that Congress intended the original admission to be used as the date of admission because he left and reentered within his existing period of admission and therefore did not affect the status quo. And I think this is also made clear by other provisions in Section 1227. For example, 1227A1G, in that provision, Congress created a grant of deportability for aliens who obtain any admission by virtue of marriage fraud. Likewise, in 1227A1E1, Congress created a grant of deportability for aliens who facilitate alien smuggling within five years after any entry. So if Congress wanted the clock to be reset any and every time an alien reentered the country, it easily could have drafted the statute to accomplish this result. Why did it create this exception for the lawful permanent resident? I'm sorry? The lawful permanent resident under the statute can be gone for up to 100 days or so. Correct. If he comes back, he doesn't have to seek remission. Oh, yes, that is true. We don't dispute that. And we don't dispute that the petitioner in this case was seeking admission when he returned in 2003. I'm just trying to compare that statute to what we're dealing with here. You say that Congress could have said this, and it did say it in the case of lawful permanent residents. Basically, it says, if you don't come back within 180 days, you've got to seek remission. And so to carve out this period of time that allowed him to come back up to 179 days, there's no such thing here. No, but even in that case, even if a lawful permanent resident came back after 180 days and was seeking admission, if that still begs the question, does the more recent admission reset the five-year clock? Wouldn't seem to me. I mean, the statute says he's got to seek admission after 180 days. If we were dealing with a lawful permanent resident, but you've got that, if he comes within that 180 days, up to 179, then you've got that little, what you would want in this case, that admission is still good from the beginning. But again, Your Honor, We don't have that here. That would still beg the question of which admission counts as the date of admission. So the fact that my client was seeking admission when he came back in 2003 doesn't answer the question, well, did he reset the five-year clock? Did that then thereby become a new date of admission? Aren't you making a very persuasive argument for ambiguity? Well, It seems to me that just listening to what you're saying, Well, let me just raise my final point about step one. I'm interested in you addressing, if we disagree with you as to your interpretation of what you see to be the plain meaning and find that the statute is ambiguous, what is your best argument for saying that the interpretation of the board is arbitrary or capricious? Sure. Well, we have two arguments with respect to step two. First, we argue that Chevron deference, that the board's decision is not eligible for Chevron deference because it was unpublished. And an unpublished decision is only eligible for Chevron deference to the extent the result is directly controlled by a published decision. Now, the published decision at issue is a matter of oligarchy. Right. But we argue that matter of oligarchy does not directly control the outcome of this case. The facts of both Mr. Aliagi himself and the hypothetical alien discussed in that case are quite distinguishable. Mr. Aliagi was only admitted on one occasion and then adjusted to LPR status. Mr. Aliagi was very clear, though, when they said that we find that the most natural reading of this section in question is that the phrase date of admission refers to the date of the admission by virtue of which the alien was present in the United States when he committed the crime. That's pretty clear, isn't it? I think there are other parts of the decision that make it ambiguous. I can see that that is a plausible reading of Aliagi. I don't think that it is the only possible reading of matter of oligarchy. Isn't that all you need from the perspective of giving deference if their interpretation is not unreasonable? No, no. The point I was making is that Judge Kenyon's reading of matter of oligarchy is a plausible reading of that decision, not of the statute itself. So our argument would be that you only give Chevron deference if it is absolutely clear that the board's decision is compelled by a published decision. Now, moving on to whether assuming that matter of oligarchy does dictate the outcome of this case, we have two arguments about why its interpretation was impermissible. First, the first reason involves the method that the board established for determining the date of admission. To determine the date of admission, the board instructed immigration judges to first look at the date the crime was committed and then to determine whether the alien was in the country pursuant to an admission within the prior five years. But that test flips the statute on its head because the statute refers to crimes that were committed within five years after the date of admission, not admissions that happened to occur five years before the date the crime was committed. So by the statute's very terms, immigration judges must first determine the date that the crime was committed and then determine whether the crime was committed within five years after that date. Now, what the government argues in response is that it would be, quote, pointless to parse through all of an alien's past admissions in order to identify the relevant date of admission. Now, we respectfully disagree. In light of both the text of the statute and the severity of deportation, it is not pointless to require immigration judges to first identify each of an alien's prior admissions  I think what the government fails to appreciate is that an alien's date of admission exists independently of any crime that he or she may later commit. So in other words, immigration judges should be able to determine the date of admission without regard to an alien's criminal history. To hold otherwise would mean that two aliens who entered and reentered the country on the same dates could have different dates of admission depending solely on when their crimes were committed. Now, to use an example from this case, imagine that the petitioner committed his crime in 2002 but for whatever reason was not charged and convicted in 2007. If that were the case, the government would no longer be arguing that his date of admission was in 2003. They would be arguing that his date of admission was in 2001. So under matter of balayage, the tail is wagging the dog, so to speak. The date the crime was committed is determining the date of admission when what the date of admission is is an independent question that immigration judges should be addressing first. Now, the second respect in which matter of balayage is impermissible is that it made no attempt to account for the reason that Congress created the five-year clock in the first place. I think it goes without saying that Congress created a five-year clock to exercise some measure of leniency towards aliens who have been in the United States for five years before they commit a crime involving moral turpitude. If Congress did want not to exercise some measure of leniency, it would have created a five-year clock in the first place. Now, resetting the five-year clock every time an alien seeks admission to the country would therefore not reflect a reasonable balancing of the policy considerations that Congress has entrusted to the agency's care. Under matter of balayage, regardless of how long an alien has lived in the country, they could be placed in removal proceedings based on the commission of a crime involving moral turpitude simply because they happened to travel abroad within the previous five years. Now, matter of balayage, it doesn't even address this rather obvious consequence of its decision. The board simply said it found the language of the statute ambiguous and then declared that immigration judges should look to the date the crime was committed in order to determine the date of admission. Now, it's worth remembering that the underlying purpose of Chevron is to defer to agencies on issues over which they have expertise. So when the intent of Congress is unclear, an agency should identify the various options before it, weigh the pros and cons of those options, and then settle on what it believes is the best option. Now, the board didn't do that in matter of balayage. It didn't employ the traditional tools of statutory construction. It didn't acknowledge the harsh consequences that its decision would have on aliens who had resided in the United States for decades but happened to travel abroad. And it didn't explain why aliens with identical travel histories, identical travel and immigration histories, could have different dates of admission. So simply put, a court should not defer to an agency under Chevron when the agency has not used its expertise in the first place. You know, looking at the facts here, I mean, we can look at a lot of other parameters and all permutations of how cases can come out. But here, your client reentered the country in January of 2003, and then the crime you're talking about was committed in December of 2007. I mean, you want it to be that you can leave, come back, even though you're not a lawful permanent resident and you don't fit within that 179 days, that you leave, come back, that date of admission for the first time, the interment is going to control any crimes that occur when you reenter the country. May I respond, Your Honor? Please. Yes. I mean, I think with respect, I think the lawful permanent resident issue is a bit of a red herring because even then, a lawful permanent resident who came back after 180 days,  Our argument is simply that a non-immigrant does not reset the clock if he leaves and reenters within his existing period of admission because he does not affect the status quo relative to his immigration status or with respect to the amount of time that he's allowed to remain in the country. I'll reserve the remainder for rebuttal. Chief of the Government. Good morning, Your Honors. May it please the Court. Laura Halliday Hicken for Attorney General Loretta Lynch. And in this case, I think there really are two issues. The first is Chevron deference to the Board's presidential decision in matter of aliasgee and the Board's reasonable construction of the ambiguity in that case for identifying the relevant date of admission for purposes of the five-year clock. And second, the issue is whether, in this case, the Board correctly identified 2003 as the relevant date of admission in Mr. Sijapati's case. And so I can take first deference. And there is an ambiguity, as the Board identified, in 8 U.S.C. 1227-82-AI. The distinction I've been talking about on the lawful permanent resident is the exception there. Does that help your cause? That is the issue that's fundamentally underlying our case. And opposing counsels, the crux of his argument is fundamentally flawed as to admissions. And that's because in his argument, he asserts that when he was admitted on this L-2 visa in 2001, he then was able to leave the United States and retain his status as an admitted alien, and that is not a benefit that nonimmigrants are entitled to. Nonimmigrants can affect an admission to the country, and while they're in the United States, they're admitted. When they leave the United States, that period of admission is over. Well, see, I'm speaking to the first prong of the Chevron test here. The question of ambiguity is whether that lawful permanent residence statute helps to inform that this is an ambiguous statute. Of course, your opposing counsel said that's a red herring. He says it doesn't matter even if an illegal permanent resident has a lawful permanent resident status. When he comes back, even if it's past 180, that doesn't mean that the first one doesn't apply. Right. I respectfully disagree. I disagree with that. And the government submits that lawful permanent residents are entitled to the benefit that Your Honors discussed of being able to retain their status as an admitted alien despite brief departures out of the country. That's a benefit that only lawful permanent residents are entitled to. But they also can subject themselves to being considered applicants for admission. There are certain grounds enumerated in 101A13C that would cause a returning lawful permanent resident to be considered an applicant for admission, and one of those grounds is a departure of over 180 days. At that point, a lawful permanent resident returning to the United States would be considered an applicant for admission. They would have a new date of admission even as a lawful permanent resident, and that is something that would then restart the five-year clock even for a lawful permanent resident. That could be avoided by not departing the country for that period of time, but the benefit that lawful permanent residents are entitled to is exclusive to them. That's a unique benefit that Congress specifically carved out. Non-immigrants, like immigrants on L-2 visas or others, are not entitled to leave the United States and retain the status of an admitted alien. When they leave the United States and they're in their home country or they're elsewhere, they're no longer admitted. They may have the possibility of obtaining an admission in the future. I mean, a visa is valid for a length of time, three years in this L-2 visa case, and the visa, Mr. Sijapati's visa, was valid for multiple admissions, an unlimited number of admissions during that period of time. But that does not mean that he was admitted throughout the entire period of the visa's validity. That's not the case. When Mr. Sijapati left the United States in 2002 and he presented at the port of entry in 2003, he presented as an applicant for admission. That's the only way that he could obtain the 2003 admission. And opposing counsel doesn't dispute that the 2003 admission was a date of admission. And really, that's the point of the government's argument and the point of the board's analysis, which is that the statute 8 U.S.C. 122072A is ambiguous in the sense that it specifies a single date of admission, the date of admission. But people in their lifetime can accrue any number of admissions. You could have admissions throughout childhood, adulthood, student visas, tourist visas. And so the statute does not answer the precise question of, what is the relevant date of admission for purposes of the five-year clock when it's possible that people have multiple lifetime admissions? And the board resolved that ambiguity in a clear and consistent way. And actually, Mr. Sijapati's case is a good example of how. So three years is your opportunity of coming to the court for a period of time. Is that correct? That's exactly right, yeah. And if done, give me a period of time. Three years with this. Oh, two years. So you've got three years to come in. And during that three years, you can remain in this country the whole time, walkable. Sure. And at the end of the three years, you've got to go home or do something, right? Right. So if you go home at the end of the three years, then you come back. Clearly, that would be a date of admission. It seems like to me you're coming back in. And the contention here is if you have a three-year period in which you admitted to be in this country, if you go back for Grandma's birthday or you go back for just to go back and pay some taxes and come back, every time you do that, you're saying it's a date of admission. Every time a non-immigrant does that, that's a date of admission. They're not entitled to the benefit of being considered admitted aliens. But they're not being given a new visa. Is that correct? It's not a new visa. The visa, and it's very clear to me. And I'm not arguing against you. I'm just trying to make sure I understand. They're not being given a new visa. They're coming back on the existing visa. Exactly. So the one that's already given them a period of three years, they just simply, but you're saying the chain can't be broken. That's essentially what you're saying. You're saying if you've got three years, you can't break that three-year period. As long as you give them three years, that date of admission will be back to three years. But if you leave to go back to Grandma's birthday and then come back, it starts new. Exactly. It starts new. Non-immigrants are not entitled to leave the United States and retain a period of admission. And this is where our argument finds that opposing counsel is fundamentally flawed. There's absolutely no support for his argument that non-immigrants. Well, it seems to me that if we take the lawful, I don't want to hit on this lawful permanent resident because I think that statute is informed to some degree. If you're a lawful permanent resident, how long can you stay here? Lawful permanent resident status doesn't expire. So you could stay here the whole time, but if you leave and leave for a period of 180 days, you lose it. You don't lose your lawful permanent resident status. You have to get another date of admission. But you will have another date of admission. And that was a benefit that Congress specifically extended. And I think, Your Honor, it's important to focus on lawful permanent residents because it does inform this case. Congress granted LPRs a benefit. And this is because LPRs, as I noted, their residency period doesn't expire. They have great ties to the community and historically have been granted greater protections. And so they have been granted the benefit by Congress of being able to depart for these brief and casual trips and return without being considered applicants for admission, without being subjected to the greater heightened scrutiny that applicants for admission are subjected to. They're called returning lawful permanent residents. It's a unique circumstance. It's not available to non-immigrants. Petitioner would like to import those regulations and that benefit that Congress provided to LPRs to his case. And there's simply no basis whatsoever for that. Non-immigrants, the benefit that a non-immigrant is receiving, like an L2 visa holder, is a benefit to be able to come into the country in the first place. You get a visa authorized for a certain period of time, and that's what allowed Mr. Sijapati to enter the country and be admitted to the country. That was his benefit. And if he leaves, he is no longer admitted. But as long as his visa is still valid, he's still able to return. Now, if Mr. Sijapati, and this is important as well, in 2003 when he presented at the border, say that the immigration officials at that point had found him inadmissible, say he'd already committed the CIMT or for some reason they weren't going to admit him, he would be charged under 1182 as an applicant for admission, and there's no dispute. And let me just briefly step back and say that there's two bases for removability. 1227, this case, which applies to admitted aliens, and all the grounds of removability under 1182, the grounds of inadmissibility. And those apply to applicants for admission. When Petitioner would have presented at the border in 2003, and if they had found him inadmissible, he would have been charged under 1182, not 1227, because he wasn't an admitted alien. And there's simply no basis for him to have made the claim that he had retained this status as an admitted alien. He is not in a position to receive the benefit of being considered an admitted alien when he left the United States when he was not physically present. And so the board, in a matter of alias-gy, put forward a very straightforward means of identifying the relevant date of admission. And Mr. Sijapati's case is a good example. Because he committed the crime of moral turpitude in 2007, the board then looks at by virtue of what admission was he in the country to commit the crime of moral turpitude, and that was his 2003 admission. And the government's point about why it's necessary to look at all a person's lifetime admissions is just that. All we need for 1227 is the relevant date of admission for purposes of the five-year clock. It's not necessary to first identify all admissions. I mean, it's certainly possible to identify all the admissions without any relation to the CIMT. But the board is trying to apply that crown of removability and identify the relevant admission in that instance. And they put forward a definition that provides the relevant admission consistently in all cases. It doesn't matter how many admissions a person has. This definition will identify the relevant admission. As it did in this case. It identifies 2003. If a person has a visa for three years and decides to go home for a week or so, when they come back, what do they have to do to get into the country? Is it any different than a U.S. citizen other than showing their passport and the fact they've got this visa going for three years? Well, when they, yeah, I mean, they have to show their visa. Citizens get inspected at a different board of entry than people who are noncitizens. And so they, I mean, it's possible that they could be found inadmissible. If the visa was issued but they had subsequently committed a crime and the immigration officials had knowledge of that, just because you have a valid visa doesn't mean you're absolutely entitled to be admitted. There could be something that comes to light in the immigration officials' scrutiny. But in the normal course of things, if you've got a three-year visa and you go home for a week and come back, you really don't have to do very much than what a citizen would do except show their visa and then walk on in with your passport. Well, I suppose. But it doesn't really have anything to do with what a citizen would do. It has to do with affecting an admission. I'm thinking of being admitted. We don't say citizens are being admitted when you come back into the country. Citizens cannot be admitted. That's not, yeah. So we don't do that. That's why I'm saying that. I'm just using that as a paragraph. How different is it for a citizen or a person who has a visa? You have a period of time you can be in this country. You can go out and come back in as much as you want to. You don't have to go through the whole initial process of asking to come in the country as you did when you first secured the visa. You just simply show it. You've already got it, and you walk back in.  There's an initial process of obtaining the visa. So there would be the initial process, which a lot of times people actually do in their home country, to actually obtain the visa. And then that would require... You see where I'm going with that, don't you? You see where I'm going in terms of just what is it? If we're saying it's a date of admission, is there anything that triggers it other than you can walk across the border, turn around, come right back across the border,  Sure. It's another thing to be here, be outside the country, and you can't just walk across that border. You've got to do something. You've got to first get that visa, then come in. But in the interim period of time, you just walk across the border, turn around, come right back, show it, and you say that's a date of admission. Yeah. What's relevant here is the INA defines admission under 101A13, and that admission is lawful entry after authorization and inspection by an immigration officer. And opposing counsel doesn't dispute that 2003 was an admission. It fits within the definition of admission under 101A13. There's nothing else it could be. It was an admission. And so Mr. Sijapati has an admission in 2001. He has an admission in 2003. But the 2003 admission is relevant because it was the admission by virtue of which he was in the United States when he committed his crime in 2007. The board's definition also gives effect to adjustment of status from within the country. As this court instructed the board in matter of Aremu, adjustment of status within the country is not, the court found would not constitute a date of admission for purposes of restarting the five-year clock. And so here Mr. Sijapati had a 2005 adjustment date as well as this 2001 admission date. And the board's definition when it's applied clearly identifies the 2003 admission date, and that's a consistent, reasonable way of identifying the date. It doesn't matter how many admissions any given person has had. It doesn't matter what type of visa they're here on. Petitioner's counsel referred to T&U visa and their continuous presence requirements. Continuous presence requirements are different. They could be a period of continuous presence could be satisfied by multiple admissions as long as it fits the continuous presence requirements. But if you had a U or T visa holder who committed a crime of moral turpitude, then when the board looked at the date that the crime was committed, they would look back and say by virtue of what admission was this T or U visa holder in the United States when they committed the crime of moral turpitude. Once they identify that date, it doesn't matter if that was that person's first admission on the visa or their 20th admission on the visa. That's not what's relevant. Nonimmigrants are simply not entitled to retain their status as an admitted alien when they leave the country. There's absolutely no basis for that in the INA, and that's why the board's decision finding the 2003 admission is so straightforward and why they don't consider the 2001 admission because it's really not relevant. It has no greater significance in admissions law than the 2003 admission has. They're just both admissions in the normal course of being admitted under 101A13, and the critical difference here is the LPRs and the benefit the LPRs are entitled to, which is specifically laid out in the statute 101A13C, explaining that lawful permanent residents are entitled to the benefit of being able to retain their status under certain circumstances where they can leave the United States, be in their home country, be elsewhere, and still be considered admitted to the United States. That's a legal fiction. I mean, it's legal fiction. They're not technically in the United States, but Congress specifically granted them that benefit, so they wouldn't be subject to the scrutiny of being an applicant for admission after brief and casual trips. That is not a benefit that nonimmigrants are entitled to. Admissions under 101A13 is simply an admission in the usual course, and opposing counsel agrees that the 2003 admission was that, an admission in the usual course, and it's a fundamental flaw in opposing counsel's argument that there is some sort of existing period of admission or readmission. Those are phrases that he's using. They're not in the INA. They're not in the statute. They're not defined. They may appear, like a period of admission appears, a period that someone's been admitted, but it's not a defined term. Readmission is not a defined term. There's not something that would grant that benefit of a pervasive status. Exactly. You can say a lot of words here, but when it comes down, this is just a question of whether or not it's entitled to Chevron deference in this decision. And if it's so, then was the BIA's interpretation capricious or was it arbitrary, even if you could see different sides of the story? That just seems to be the essence of your position. Right. The essence of the case. And that's exactly it. The board, looking at the ambiguity of being a single date of admission, the statute identifying a single date, looked at the ambiguity of how to identify this relevant date when a person might have multiple lifetime admissions. The board's decision was based on multiple considerations, including not giving undue weight to long past admissions, not making sure that the admission is tethered to a period of presence and the period of presence in which the crime was committed, and also giving the proper effect to adjustment of status as the court instructed the board in matter of arraignment. And so government, unless there's further questions, the government submits that the court should defer to the board's decision in matter of aliazgi and find that the board in this case identified petitioner's admission as the 2003 admission date. Thank you, Your Honors. Thank you. Required. If I could just return to the LPR example that we were discussing. So assume that you have an LPR that was admitted to the United States in 1970, lives in the United States for 40 years, takes a nine-month vacation in 2010. When he comes back in, we agree that he would be regarded as an applicant for admission. But it is an open question whether the LPR would thereby reset the five-year clock for purposes of this statute. The board has never addressed that. We are aware of no case discussing that issue. If the government is aware of such a case. We don't need to go there. No, you don't. That's not where we are. No. We're dealing with Chevron deference. The question first is whether that statute is plain. Sure. We get beyond that. Then we're dealing with whether this decision is controllable. Sure. And whether it is arbitrary. Yes. And more in terms of my question, I got to thinking about it. Every time an individual, even on a visa, you've got a three-year visa, you walk outside of this country, you've got to be admitted to come back into this country. You can't just, even if you do show the visa, you have to show some basis for getting back into the country. Yes. And I'm just looking at it. Is it unreasonable? I mean, I can see both sides. Yeah, he's in here. He's already admitted. But you can't walk away from our country and say I'm admitted in the United States until you come back. Then you can't. Then you've got to go through those procedures to get back into this country. Well, there's a distinction. While my client was seeking admission when he came back in 2003, he already had the visa in his possession. He didn't have to do anything beyond show up at a port of entry. But in the country. He was out of the country when he came. He had that visa, but he wasn't here. No, of course. And that's the difference is, I don't know what the purpose of the five years. I mean, I would say the five years is you've been here long enough continuously that you are going to now, we're not going to hold this against you, so to speak. But if you break that five years and leave this country, you don't seem to have the same benefit if you have that continuous relationship in the country. If I'm digging down into why you even had it in the first instance. Well, I think if you can think about it in contractual terms. When an alien is admitted for the first time. He doesn't have a contract with this country from that perspective. I'm making an analogy. When he's admitted for the first time, he's allowed to remain in the country for a set period of years. But one of the conditions on his admission is that he cannot commit a CIMT within five years of admission. Now, when an alien travels abroad and reenters within an existing period of admission. That's my point. It's within the five years of admission if he stays here. And maybe the basis for that because you've been in this country the whole time and you don't know of anything, everything you've been doing is here. You go back to some other place. You don't know what's going on back there. The same basis for having a five-year period seems to be recreated because you're coming back in to the country. Maybe they changed a different person. I don't know. Well, to the contrary, when they come back in, they don't receive any benefit to which they were not previously entitled. When my client came back in 2003, he wasn't required to apply for a new visa, and he didn't thereby extend his period of admission. There was no consideration in contractual terms when he reentered the country. Now, the ultimate question at step two is whether the agency decision reflects a reasonable balancing of the policy considerations that Congress entrusted to the agency's care. That's from this court's decision in Philip Morris v. Vilsack in 2013. So the question I think the court needs to ask is, why would Congress want the result that the government is advocating in this case? Why would Congress want to subject an alien who's lived in the country for 50 years to removal proceedings simply because they happened to travel abroad even for one day within the previous five years? Neither the immigration judge, the board, or the attorney general has provided an answer to that question. I mean, look at it from the perspective. You got a three-year visa. You stay here for two months, and then go back home for the next year and a half or two years. They come back. Why would the date of admission be back to the first time you came into this country? You haven't even been here two years. Again, because you were still within the existing period of admission, because you were not required to leave. You're talking about an absurdity. Why would you even give them the benefit? You give them a benefit of, say, five years, and you stay here, and you're a good person in this country and doing those things that you're supposed to do. On our laws, then after five years, you get a benefit. But you leave and go away for two years. We don't know what you're doing. We didn't give you just date of admission. Now go back home and then come back. But that person could be potentially denied entry at the border if there was a reason to leave. But does it have to be because he has a visa? He's just walking back in. And that's all I'm saying. You've got the same situation here. The point being is that it can go both ways. It can go your way or it can go the other way. And if we give deference to this decision, our determination, if we find this ambiguous in the first problem, in the second problem, is it arbitrary and capricious? Sure. May I respond, Your Honor? I would just remind the court that under the Chenery Doctrine, it is limited to relying on the rationale that is articulated by the agency itself. The colloquy that we've been having today, in matter of balayage, the board didn't even get into that. It didn't even look at the consequences of its decision. It didn't even weigh the pros and cons. It just kind of by diktat said, well, this is the rule we're going to apply, and we're not going to explain why. So I would just say the court should not be relying on purported benefits of the rule of matter of balayage that the board itself did not articulate. We're going to come down to Greek Council and then go into our next dates.
judges: William B. Traxler, Jr., Barbara Milano Keenan, James A. Wynn, Jr.